Booth, Judge,
delivered the opinion of the court:
The plaintiff company on April 30, 1918, entered into a written agreement with the defendant to supply, among other things, 440,000 magazines, to be used by the defendant in connection with Lewis machine guns. The contract was made during the war with Germany, and was one among several others obligating the plaintiff to furnish the defendant with arms and munitions of war.
On January 29, 1919, following the armistice, the defendant notified the plaintiff in writing that it would suspend *81 the contract to the extent of 298,000 magazines, and invited negotiations for a supplemental contract looking toward a prompt adjustment and settlement of contract rights. The plaintiff company, for some reason, contended that the suspension notice was erroneous and should not have been for the total number of 298,000 magazines. An alleged verbal conversation, and one or more over the telephone with the officers of the defendant, members of the Rochester District Claims Board, located at Rochester, N. Y., according to its version of the affair, resulted in a verbal statement that the suspension order was construed by them as not intended to extend further than 142,000 magazines. The plaintiff wrote the Rochester District Claims Board on February 13, 1919, stating that the suspension order was erroneous, and asking for a corrected suspension in accord with its verbal understanding, a matter over which it had no jurisdiction. As a result of this misunderstanding a considerable correspondence ensued and considerable time elapsed before the negotiations culminated in a settlement. In the meantime the plaintiff proceeded with the manufacture of magazines and did not suspend until May 7, 1919, when it had completed and delivered, and on May 21, 1919 received payment for, 298,000 magazines, notwithstanding the fact that its letter of February 13, 1919 had not been answered, and that no correction of the suspension order of January 29, 1919 had been obtained. No competent evidence discloses any authorized amendment or correction of the suspension order of January 29, 1919, nor can we find in the record who gave it or what its exact terms were, other than-that 142,000 was the number to be substituted for 298,000 magazines. Thus we find the plaintiff acting upon a verbal modification of a written order of suspension extending expressly to 298,000 magazines, manufacturing, delivering, and receiving payment for the identical number it had been notified to suspend, and making but one feeble effort to have the verbal modification put in writing, until a date subsequent to the time when said magazines had been delivered and paid for. The plaintiff’s attitude then, at this stage of the proceedings, as shown by the record, was simply this: We received a written order to *82 suspend the manufacture of 298,000 magazines. We communicated with the defendant and it was verbally agreed that we might furnish 298,000 magazines and suspend 142,000. We furnished the 298,000; the defendant paid for them. We then in January did suspend the 142,000. We made no effort to manufacture or deliver the same, but on the contrary specifically asked for and agreed to accept a suspension order for the 142,000.
Why do we say this ? Because the inference is irresistible. After the plaintiff had completed the manufacture and delivery of the 298,000 magazines and been paid therefor, its officers realized that this transaction had been closed upon the bare, uncertain authority of a verbal order, and therefore it was persistent and energetic in its efforts to have this past transaction officially and expressly closed by the proper authority, so that in no event could the large sums of money it had received thereunder be checked against other sums due the plaintiff under other contracts, aggregating millions of dollars.
This view of the situation is expressly confirmed and substantially put at rest by the letter of July 8, 1919, written by the plaintiff to the Rochester District Claims Board, wherein the plaintiff in positive terms expressly agrees to waive all claims for any portion of alleged damages due to the suspension of 142,000 magazines, if the officer addressed will “ make immediate arrangements * * * for suspension request to be sent to us through your office terminating the above-mentioned C. M. G. 48-A contract.” This letter of July 8, 1919, was the result of a verbal agreement between the plaintiff and the officers of the Rochester District Claims Board, subsequently ratified and confirmed by the Chief of Ordnance of the War Department at Washington. The history of this transaction alone is sufficient to determine the case adversely to plaintiff’s contention. The plaintiff had suspended the manufacture of 142,000 magazines, a conference as to its claims had taken place between its representatives and the officers of the Rochester District Claims Board, where the plaintiff’s representatives talked over the possibility of a claim for profits on the 142,000 magazines suspended, and at the same time a claim for a large sum *83 of money due to a change in design of the magazines made during the course of manufacture. This claim embraced a charge for an alleged “lost production,” a damage due to a slowing down of production caused by the addition to the magazines of Yeeder counter indicators and dust covers. It was not confined alone to the number of magazines manufactured under contract C. M. G. 48-A, but by its own terms included 16,661 magazines delivered under contract C. M. G. 48. The total amount claimed is $181,213.27, arrived at by charging a certain percentage of overhead expenses against the manufacture of 314,661 magazines, or 16,661 in excess of those delivered under contract C. M. G. 48-A. The officers of the Rochester District Claims Board declined to consider any claim for lost profits, at the same time representing to the plaintiff that pursuit of a claim for profits in the United States Court of Claims involved a period of time extending for at least half a century, an interminable controversy, with no hope of immediate redress, and the plaintiff, without investigation, however preposterous the statements were, accepted the same, and expressly agreed that the allowance of the claim for lost production would be accepted by it in full of all claims and demands whatsoever growing out of the suspension of the manufacture and delivery of the 142,000 magazines then undelivered. The above claim was mailed to the Rochester District Claims Board July 10, 1919, and received July 12, 1919. This 'most remarkable transaction, though finally culminating in the dis-allowance of the claim as presented, remains a most potent factor in depicting the attitude of the plaintiff toward a settlement of differences with the defendant, another step toward the procurement of an authenticated suspension order for 142,000 magazines, and an express approval of what had been done under its contract. The transaction itself was quite unique, the plaintiff agreeing to balance one claim against another, both of substantially the same character, inasmuch as both involved anticipated profits. The contract in express terms authorized changes in the specifications and design of the articles to be furnished, and provided a method of payment therefor. There was little or no room for dispute, yet we find the plaintiff company presenting a *84 disputatious claim under this very article of the contract, totaling a sum far in excess of the compensation afterwards agreed upon, and making it the basis of a composition, which would in the end reimburse it for very close to the amount it now claims as anticipated profits on the undelivered 142,-000 magazines. Stranger still, while this very claim is pending and undisposed of, negotiations are going forward looking toward an agreement for the payment of the cost of the change in specifications and design — the change involved in the large claim presented, and the only one made in the contract — which finally results in the allowance to plaintiff of the sum of $26,711.03, which amount the plaintiff accepted, after the formal disallowance of its item for lost production or increased overhead expenses, to wit, November 12, 1919. What reason there was for a division of this particular claim is explainable only upon the hypothesis that the plaintiff anticipated thereby the securement of the suspension agreement, the approval of its course in manufacturing the 298,000 magazines in the face of an express suspension order for that number, and effectually closing the transaction against the possibility of a checkage against the 156,000 magazines manufactured and delivered in excess of those suspended, as well as a means of invoking the jurisdiction of the Eochester District Claims Board upon a claim which it considered within its jurisdiction, and facilitating its allowance by a proposition to forego all other claims— of which the board had no jurisdiction — if the exact amount claimed would be allowed. Having failed to reach a final adjustment in the method described above, the plaintiff, still extremely anxious to close the transaction, approached Mr. Horton, and on August 20, 1919, wrote the letter set forth in Finding IV. In this letter the failure to receive the corrected suspension order is again stressed, and the language of the same clearly and unmistakably indicates its acceptance is to be treated as a termination of the contract. Negotiations follow, and the course of the negotiations, together with the final result, and the acceptance of the $26,711.03, disclose an agreement, express and beyond doubt, to close the differences between the parties upon the basis agreed upon. The confirmation of this final agreement does not *85 rest wholly on parol evidence, for in accord with what was admittedly said by the respective parties, appears the written suspension order of September 12, 1919, from the Chief of Ordnance in Washington, wherein the number suspended is given as 142,000 magazines instead of, as in the original order of January 29, 1919, 298,000 magazines. The effect of this was an authenticated acceptance of the 298,000 magazines theretofore delivered, and for which the defendant had no use whatever. The fact that for a period of nine months negotiations had been pending; that during all this time . the defendant did not alter, modify, or change the original suspension order, notwithstanding the insistence of the plaintiff that it was erroneous, and especially in view of the fact that the Ordnance Office at Washington did not concur in this contention, coupled with the final change, corroborates with indisputable force the fact that there was an express agreement to close the transaction on the basis of the acceptance without question of the 298,000 magazines, the payment for the change in design, in consideration of which the plaintiff agreed to waive all claims for prospective profits, and close the transaction on its books.
This change in the order, whereby the plantiff proceeded to make and deliver 298,000 magazines instead of 142,000, was acted upon by the plaintiff without any kind of objection on its part. It not only suspended any manufacture of any part of the 142,000 magazines prior to its letter of February, but after completing the 298,000, and being paid therefor in full, the plaintiff did not at any time ask to be allowed to make or deliver the balance of the magazines. It desired, for manifest reasons, to close the matter on its books, and it asked for a corrected suspension order looking to that end. Its entire action showed not only a willingness, but a purpose, to accept the modified order and to acquiesce therein. It must be held to have agreed to the modification of the contract to the extent, at least, that it would not expect to manufacture or insist upon a right to manufacture and deliver the 142,000 magazines. Having thus accepted the modification of the contract, it can not recover the prospective profits now claimed. The right to recover prospective profits involves a breach by one party of the contract, while *86 there is a readiness and willingness of the other party to perform; but where it is agreed that there shall be a partial performance, manifestly there can be no recovery of the profits that would have been earned if the performance had been complete.
It is elementary and we need not cite authorities to sustain the proposition, that where a contractor under obligation to furnish a stated quantity of article finds his contract canceled and subsequently negotiates for the delivery and acceptance of a less quantity than originally intended, accepts payment therefor and a modification order in accord with the agreement he can not then assert a claim for the undelivered balance. The position of the parties has been materially changed. The contractor must stand upon his legal rights under the original cancellation order; he can not abandon ■them and enter upon the performance of the agreement in accord with the accepted changes, and at the same time assert the binding force of the original contract. Two avenues of redress were open to the contractor'in the first instance, and the right of election was his. He might choose the course which in the end entailed the least loss, and induce the'other party to accept a part performance in lieu of a total or partial breach, or he might treat the contract as at an end and sue for damages. He can not accept one remedy without losing the other.
On September 24, 1919, for the first time, we find a written reservation of the plaintiff’s alleged claim for prospective profits on the 142,000 magazines undelivered. It at once arouses an extremely pertinent inquiry. Why this belated assertion of a claim which in all the correspondence between the parties — set forth in the findings — is not once reserved or treated in any other fashion than an unconditional surrender? We would dislike to indulge the inference that during this long period of time this particular claim was employed as a potent instrumentality to extract from the defendant a settlement advantageous to the plaintiff’s securing a final and complete adjustment of its business transactions with the defendant under its contract, and after having served its purpose in this respect appear again as an assertion of a separate and distinct liability. The officers of the defendant, *87 beyond the peradventure of a doubt, believed and treated it as settled in the agreement made. The correspondence of the plaintiff, in every letter and in every request, expressly mentioned its existence and agreed expressly to accept the suspension notice for 142,000 magazines without qualification or reservation. As late as August 20, 1919, the plaintiff wrote the defendant to this effect, as set forth in Finding IV.
Language so exact and often repeated is not susceptible to doubt and misunderstanding. The plaintiff had many and very extensive contracts with the defendant. It must have known the effect of its correspondence and the words it used.
The president of the plaintiff company was evidently not familiar with the negotiations between the company and the defendant, prior to September 12, 1919. On September 24 he acknowledged in writing the receipt of the modified suspension order and very innocently inquired as to whether the Eochester District Claims Board had jurisdiction to settle and pay a claim for prospective profits, a question which had long since been answered by the board to the company’s accredited representative and about which no one actively connected with the transaction had the slightest doubt. The board on September 26, 1919, promptly notified the plaintiff that it had no jurisdiction of a claim for prospective profits^ in answer to which the president of the company manifested an entire unfamiliarity with the transaction, for he therein stated that the plaintiff had offered verbally to accept the notice of cancellation of the contract C. M. Q-. 48-A. on the basis of payment of anticipated profits thereon. The record is directly contrary to this assertion. No claim for anticipated profits on the 142,000 magazines was ever filed with any department of the Government, at any time, by any person, and the only verbal conversations shown by the record with reference thereto, except the talk with Colonel Crane, was the inclusion of all outstanding claims in the agreement made between the plaintiff and Colonel Horton,, The only reason we can ascribe for the three last inquiries addréssed to the board is an utter lack of knowledge of what had taken place. The plaintiff never attempted to deliver the 142,000 magazines; on the contrary, it is expressly as *88 serted that their manufacture was suspended prior to February 13, 1919. The contract had already been formally canceled, and many months before formally suspended. The plaintiff’s dealings with the Eochester District Claims Board had but recently been formally closed; it knew from a long course of daily contact with the board the extent of its authority and the detail of procedure, and the utter absurdity of repeating a situation which had been the subject of controversy for nearly ten months may be explained on the basis that the official of the plaintiff indulging the same was not fully informed with respect thereto. Otherwise we would be forced into the conclusion that the whole subject matter of the correspondence was intentionally delayed until the plaintiff had escaped all danger of controversy and trouble over its prior transactions, or was an afterthought upon which the company might hazard a claim for a large sum of money.
The petition will be dismissed. It is so ordered.
Graham, Judge; Hat, Judge; DowNet, Judge, and Campbell, Chief Justice, concur.